Good morning, and may it please the Court. My name is Holly Harris, and I'm here this morning on behalf of the appellants in the Forest Plan case and the Big Thorn case. I'll be dividing my time this morning with Mr. Winter, who will argue the third case, the Cascadia case. Mr. Winter will have eight minutes, and I will have twelve, and of that I'd like to reserve approximately four minutes for a rebuttal. This morning I'd like to focus on one claim from each of our cases. First, I'll begin by explaining why the agency violated NFMA when it relied on a voluntary habitat measure to ensure wolf viability. That's in the Forest Plan case. Then I'll turn to the agency's arbitrary determination to ignore the massive gap between its market demand projections and reality. That's the Big Thorn case. Turning now to the Forest Plan case, I'm going to focus this morning on the agency's action that was not in accordance with law, rather than the arbitrary and capricious claim. The agency violated NFMA here based on one simple premise. The agency is relying on a voluntary habitat measure to meet its mandatory obligation to maintain enough habitat to ensure the wolf's viability. It's undisputed that the agency's Forest Plan must manage habitat in such a way to ensure the viability of the wolf. Our case is premised on the agency's own interpretation of its Forest Plan, that the wolf provision, the only habitat measure, is entirely discretionary. It does not require the agency to maintain any amount of habitat whatsoever. As the government admits on its brief at 37, it does not provide, quote, a hard floor. That's exactly the problem. This Forest Plan provides no hard floor to  What is the source that you're relying on? Is it 219.19? Correct, Your Honor. The regulatory provision is at 219.19, and that is a regulation, as a reminder to the Court, that governs forest plans. This Forest Plan, as the Court has made clear in Idaho's Boarding Congress, said, and I quote, the Forest Plan must comply with the substantive requirements of the Forest Act designed to ensure, among other things, and again I quote, viability of wildlife in the forest, including the requirement that wildlife habitat shall be managed to maintain viable populations. That's at Idaho's Boarding Congress at 961. Counsel, if I could just clarify, am I correct that that regulation 219.19 was the 2000 version? It is, Your Honor, yes. And that it was incorporated by reference into the Forest Plan here? Exactly, at 599, Your Honor. Was it in the initial? It was as well. Forest Plan as well? In the 1997, yes. Explicitly incorporated into the Governing Forest Plan at issue before you. Let me turn now to the mechanics of what we all agree the agency is using habitat as a proxy to meet its wildlife viability requirements. As this Court made clear in its en banc McNair opinion, when the agency is relying on habitat as a proxy, it must describe the quantity of habitat that must remain. That determination must be, quote, reliable and accurate. That's at McNair at 988 and 99. The Forest Plan also, importantly, must have a mechanism, a means of preserving that habitat. Indeed, the entire premise of habitat by proxy is the agency has established a limit and that Forest Plan must require the agency to keep that amount of habitat. In this case, there is no such mandatory limit. The agency has not identified how much habitat must remain behind after logging and it has no provision that ensures, that requires the agency to maintain that amount. I remind the Court of the facts in McNair. The Forest Plan had a hard limit. That's at 988. But each of the cases that the en banc panel agreed and relied upon also had that similar hard limit. The Forest Plan must establish, as the Court made clear, a quantity of habitat that must remain. And in this case, the agency has failed to do so and has failed to offer a mandatory mechanism to ensure that amount of habitat stays behind. A quantity of habitat, are you referring to the 18 deer per square mile? Or is there some other mechanism that you would measure? There is no other measure. So the only habitat measure this Forest Plan provides is the wolf provision. But it's beyond the dispute between 13 or 18. There is no substantive obligation under this plan to manage for any amount of habitat. The agency here adopted a sustainability provision. Remember, the agency's experts could not identify a viability floor. They were unable to determine what that should be or how much habitat would need to be retained. And so as a result, they recommended the agency adopt a higher standard, maintain even more habitat to ensure sustainability. The problem in this case is the provision... But sustainability is aspirational. There's nothing in the regulations that requires the sustainability standard, is there? Exactly, Your Honor. And as a result, because the agency isn't mandated to meet sustainability and it doesn't know where the viability floor is, there's nothing in this Forest Plan that requires the agency to maintain any amount of habitat. Let me ask you a question to clarify in my mind. Am I correct that the Forest Plan does not state that they will maintain viable population of wolves or other species? It states it as... It certainly incorporates the viability requirement from the regulation as we discussed, Judge Gould. It's set as an aspirational goal, yes, to maintain sufficient habitat, but the mechanism, the mandatory mechanism by which the agency would accomplish that goal is lacking in this Forest Plan. So is there anything in the record that shows that the agency either has determined or has not determined what is a viable wolf population? The agency here relied on the wolf conservation assessment. That conservation assessment, according to the agency, was, quote, the best available information on wolf conservation, ER-91. The agency used that conservation assessment as its, quote, benchmark for its viability conclusions, ER-758. That conservation assessment, the agency's own experts rejected the suggestion that the agency could identify a viability floor. They were unable to do it. I would point the Court to ER-203, and I'm quoting the agency's own experts. We cannot suggest a minimum deer population because we do not know what would constitute a minimum viable wolf population. And as a result, those experts recommended this higher level. Here, that higher level is not mandatory, and the agency is free to depart from it. And what is it that requires a mandatory? The regulatory provision itself. So I'm looking here, Your Honor, at 36 CFR 219-19. Wildlife habitat shall be managed to maintain viable populations elsewhere to ensure... That speaks to me to how the agency does its management. What does it say that the plan has to contain a hard limit? The agency has a continuing responsibility under the regulations on the plan, and it may well exercise discretion to comply with this. Where does it say that the plan has to have a hard limit? In two places, Your Honor. First, the regulatory language itself to ensure it must have a minimum number of reproductive individuals and the habitat must be well distributed. Where are you reading from? I'm at 219.19, Your Honor. And in interpreting that language, this court has said the forest plan must comply with those substantive obligations, including the viability requirements. The plan itself must manage habitat, must require the agency to have that minimum amount. In a case like this, when the agency is relying on habitat as a proxy for any wolves that are out there. What was the language again? Let me begin at the beginning. At 219.19, wildlife habitat shall be managed to maintain viable... My beginning is fish and wildlife habitat shall be... With apologies, Your Honor. Yes, the sentence does begin with fish and wildlife. You got us a point. Sorry. Is that the sentence, Your Honor? It is. And I begin at wildlife. So the relevant language begins at wildlife habitat shall be managed. And then in interpreting that language, this court has made clear... Well, it says shall be managed. I had asked you what language you relied on for a hard floor. The duty to ensure. It is not a discretionary... But you can comply with the duty to ensure by having a rolling... I mean, this is an obligation for the agency and how it manages. It does not say it has to have a hard limit. It could just say... It could just mean that it has to pay attention and it has to make sure that these things are complied with as the plan is implemented. This court has made clear... I mean, this on its own terms does not say anything about any hard floor in a plan, does it? The court in interpreting that language... Does it? The language here, no, it does not. It says to ensure. And so when the agency is using habitat as a proxy, this court has required a hard limit. The forest plan in McNair had a hard limit, albeit not the holding because that was a timber sale case. But in cases that... It had a hard limit, but... Yes. That is a fact, not a holding. Agreed, yes. So what is it that requires... It says you've got to have a hard limit rather than an obligation to manage a plan on an ongoing basis. It would go back to the regulatory language itself, Your Honor. The duty to ensure... Okay, but we've already said that the language itself does not. So then you said, but there are cases that do. And you said... I would... And you pointed me to a case and that language didn't sound like it was setting a floor either. So is the answer is there isn't such a requirement or that we've recognized that you want us to recognize this now? The cases that the court has relied on when it's interpreting this habitat as a proxy have not provided such a holding. It's the facts because it tends to be in timber sale cases. The forest plan cases is here just an attack on the forest plan itself. Right. I mean, those may have been the facts and facts are significant, but the thing about facts is that they often preclude a holding. I mean, the facts are X, so you don't have to say you've got to have X because is there anything that says there has to be a hard floor? Well, the forest plan must have a mechanism, an enforceable, binding, mandatory mechanism at the end of the day. Otherwise, there is no means of ensuring the habitat remains behind. What about the agency's own obligation to manage in accordance with the law? The regulation... Why isn't that compliance with regulations? The regulation requires it to be in the forest plan. So, suggestions of aspirational hopes someday in the future when we're implementing timber sales... Can you show me which language in the regulation you're relying on? So 219.1 sub A describes that these regulations govern forest plans. Right. These obligations attach at the forest plan stage. The agency can't come back later and say, well, our forest plan doesn't require it, but we've decided to do this in a timber sale. These regulations govern forest plans. And with that, Your Honor, I'll reserve the remainder of my time. Okay. Good morning, Your Honors. May it please the Court, my name is Christopher Winter and I represent the Cascadia Wildlands Parties in 15-35233. I'd like to briefly address two issues for the Court this morning. The first, they both relate to the Big Thorn Project. The first is the deer and wolf standard, which we were just discussing. And the second, if I have time, is the NEPA violation relating to the failure to disclose dissenting scientific opinions. So we talked briefly about whether the plan itself complies with NEPA. To disclose or to discuss? To disclose and respond to, Your Honor. Is this Dr. Persons? Yes, Your Honor. This relates... I'll just skip ahead because obviously you have questions, but it relates both to the opinions of Dr. Persons, who is the foremost expert on the wolf, but also the United States Fish and Wildlife Service, who of course is the expert sister agency. And if I could just first just reference the Center for Biological Diversity case, which we believe controls this issue here. That is 349 F. 3rd, 1157. And if I could also, Your Honors, just refer to a specific example in the record to help distill this to our excerpt of record at page 560. This is the comment letter that the United States Fish and Wildlife Service sent to the Forest Service, providing comments on the draft environmental impact statement for the Big Thorn project. The Fish and Wildlife Service said, and I quote, it is inappropriate to rely on or cite in the final EIS wolf immigration as a way to maintain wolves in the project area. And this is in the Forest Service's theory that although deer habitat capability will be far below the thresholds discussed in the forest plan, that is okay because we can maintain sustainable wolf populations by having other wolves immigrate into the area from other parts of the forest. So the Fish and Wildlife Service wrote a letter to the Forest Service, detailed comments, said it's inappropriate to rely on that theory. The Forest Service asserts that it responded to dissenting opinions in Appendix B of the FEIS. And this is in our excerpt of record at page 502 to 505. If the court reviews that appendix there is in fact no disclosure at all whatsoever that the Fish and Wildlife Service or any other party objected to this critical assumption that wolves could immigrate into the area from other parts of the forest. The expert agency disagreed with that. There's simply no disclosure in Appendix B that there's a dissenting scientific view on that point. And in fact the agency, the Forest Service here, does exactly the opposite. In response to comments about concerns over low deer numbers the agency actually relies again on the source population theory. So in our excerpt of record at page 505, the Forest Service says, and I quote, low deer numbers in one area can potentially be overcome by wolf mobility. So low deer numbers in one area can be overcome by wolf mobility. This is its source population theory. And again, there's simply no disclosure that the Fish and Wildlife Service explicitly objected to that in its comments on the draft EIS. So the Forest Service relies on that as a response to comments without any disclosure of dissenting scientific opinions. So that's just one, I think, glaring example, Your Honors, of how Appendix B is ineffective at really alerting the public or the reader to the fact that there were these very severe and significant dissenting opinions, both from Dr. Person as well from the Fish and Wildlife Service, who he's worked with quite closely for many, many years. But what's our standard of review? Obviously in all of these environmental challenges there are a variety of views across even the scientific community. What is our role with respect to the specific references you've made here? Yes. Yes, Your Honor, I'm sure as the Court is aware, NEPA is a procedural statute and so the obligation on the Forest Service is simply to disclose to the public and provide a rational response to the dissenting opinions. And so under... Haven't they done that here? No, Your Honor, we don't believe they have because on that first point that we just talked about, there was simply no disclosure at all. And so that is... I'm sorry, this is about the Fish and Wildlife Service? Yes, that's correct. Well, but the Fish and Wildlife Service raised specific concerns. Yes. And those concerns were addressed. They were grouped with other concerns, similar concerns expressed by other parties. I mean, the Forest Service Fish and Wildlife Service raised concerns about wolf mortality and road density, and the Forest Service responded in the appendix to those concerns. It didn't sort of single out the Fish and Wildlife, but it did... each of the concerns it raised were addressed. Yes, Your Honor, so what I would just respond with two things. You agree with that, right? No, I do not agree with that, Your Honor, because the example that I started with... You should be careful not to say yes. I apologize. The example that I started with... So let's take the example I started out with. Fish and Wildlife raises a concern about wolf mortality. Right? This is on ER 557. Okay? Did the Forest Service respond to concerns about wolf mortality? So the Forest Service responded generally to concerns about wolf mortality in the appendix. Is that a long yes? Or is that a no? They either did or didn't. They responded generally, and so we believe the obligation is not only to respond... What does generally mean? They did not identify who made the comments. I'm asking you whether they responded to those concerns. Yes, and I think they responded generally. They did not discuss the Fish and Wildlife Service. Okay, I'm sorry. When you say something like generally, I don't know what you mean. Did they respond or did they not respond? The response they provided was not specific in detail, and that is my point, is that the Fish and Wildlife Service had very specific... So this is not a question of whether they responded to comments raised by Fish and Wildlife. This is a concern about whether the response is adequate. There's both because... I mean, if they had said these concerns were raised by Fish and Wildlife and had given exactly the same response, you still wouldn't be happy, right? You would still say they responded generally. So there are two issues with that, Your Honor. The first is a procedural issue. Why don't you answer my question? I'm attempting to, and I would say... Would you be happy with that? No, we would not be happy because there's two issues. Okay, so it's not the identification of the Fish and Wildlife. I mean, do they have to identify the source individually, or is it enough if they raise the concern? These concerns have been raised by a group. They list various people who raised the concerns and then answer them. We would ask that the Forest Service identify specifically who made the comments and an embody of the FEIS, and not an appendix in response to comments, set forth its response to those specific concerns. And when you get to draft the EIS, you can do it that way. The question is not what you prefer. The question is whether they have done something that violates law. Why is it not appropriate if a number of parties have raised concerns about road density or wolf mortality for them to say, well, we're not going to list them each individually we're going to list each concern raised by parties, and we're going to respond to it. In the Center for Biological... If you want to join the agency and do it differently, then the agency will do it the way they did. In the Center for Biological Diversity case, Your Honor, this court addressed that issue at 349 F. 3rd, 1168. This court said that to allow the agency to disclose these important dissenting opinions from expert agencies, which are held out under NEPA regulations as an important procedural component, to allow the agency to do that in the response to comments would quote render 40 CFR 1502.9B superfluous. So we just believe that needs to be in a different section of the FEIS when it raises to the level of a dispute between Fish and Wildlife Service, one expert agency. So this is an objection to the fact that they put an appendix rather than putting it in the body? That's part of it, as well as the substance and on that first issue that I started with, they simply didn't even acknowledge or disclose there was a dissenting view on that point at all, Your Honors. With that, I'll reserve the rest of my time. Thank you. ... ... ... I just wasn't sure. Was your side done? I was going to take a couple of minutes on rebuttal if the court, I recognize... That's fine. I just, I wasn't paying attention. Your side is done. Can I sit down and come back for a few minutes and rebuttal? Yes, yes, that's fine. I just, you had three lawyers over there. I wasn't sure whether somebody else was... Hold him down a chair. Thank you, Your Honor. We'll take a break at this point. ... Okay, we'll hear from respondents. Now, I see listed on the day sheet Mr. Barabender, is that you? Mr. Barabender, yes, that's correct. And then Richard Goken? Yes, Your Honor. And is there somebody on the phone? ... ... ... Your Honor, and this is Tom Linhart, Assistant Counsel for the State of Alaska. I am on the ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... It's a simple question.
judges: Kozinski, O'scannlain, Gould